Eleanor Sample Scott v. Commissioner.
Scott v. Commissioner
Docket No. 3789.
United States Tax Court
1946 Tax Ct. Memo LEXIS 130; 5 T.C.M. (CCH) 629; T.C.M. (RIA) 46174; July 24, 1946
*130 Sidney M. Cook, Esq., for the petitioner. HILL Memorandum Findings of Fact and Opinion HILL, Judge: Respondent determined a deficiency in petitioner's income tax liability for 1940 in the amount of $1,174.01. Certain issues raised by the pleadings are not now in controversy. The questions for decision are: (1) whether certain deductions claimed by petitioner as business expenses are allowable, and (2) whether certain income from petitioner's paraphernal property constituted community or separate property. Petitioner filed her separate income tax return on a community property basis with the collector of internal revenue for the district of Louisiana at New Orleans. Findings of Fact Expense Issue. Petitioner is an individual residing in Shreveport, Louisiana. She married Francis W. Scott in 1930 and was residing with him as his wife during the taxable year. Francis W. Scott was employed in an executive capacity by the Frost Lumber Industries, Inc., with principal offices in Shreveport, and was president of Slagle-Johnson Lumber Co., with principal offices in Monroe, Louisiana. Scott, in addition to his duties with these lumber companies, engaged on his own *131 account in certain mineral leasing activities. Scott negotiated mineral leases and options for major oil companies on lands owned by various lumber companies other than the ones with which he was connected. During the taxable year Scott received from $9,000 to $10,000 in commissions from these activities which required him to travel extensively. In connection with this leasing activity Scott incurred certain expenses. One-half of the expenses claimed to have been incurred by Scott were deducted by him and one-half by petitioner, each filing separate returns on a community basis. The following schedule itemizes the expenses claimed to have been incurred by Scott. Also indicated in the schedule are the amounts which we have found to be allowable as deductions. Amount deter-
Amount
mined as
Item No.
Description
claimed
deductible l1
Oil and gas lease expense
$ 20.65
$ 20.65
2
Miscellaneous Expenses: (a) Photostat of map
.56
.56
(b) Recording fee
1.70
1.70
(c) Notary fee
3.50
3.50
(d) Recording fee
6.00
6.00
(e) Title certificate
15.00
15.00
(f) Purpose unexplained
5.25
(g) Fee to agent
5.00
5.00
(h) Certified copy of deed
3.00
3.00
3
Telephone Expense
90.22
45.11
4
Traveling Expenses: (a) Jan. 16 to Monroe
$ 25.00
(b) Mar. 23-27 to New Orleans, La., Mo-
bile Ala., and Quitman, Miss.
215.00
(c) Apr. 27 to Houston
50.00
(d) May 6 to Baton Rouge
25.00
(e) June 19 to Baton Rouge
6.00
(f) June 22 to Dallas
175.00
(g) July 15 to Baton Rouge
25.00
(h) Aug. 1 to New Orleans
25.00
(i) Aug. 30 to Baton Rouge
50.00
(j) Nov. 11 to St. Louis
30.05
(k) Nov. 14 to Monroe
6.06
Less
35.00 *
597.11 **
298.55
5
Automobile Expense
490.09
245.05
6
Depreciation on Automobile
282.02
141.01
$1,520.10 **
$785.13
*132 Item 1 represents the amount paid by Scott as reimbursement to one Sweatwin whom Scott sent to the Olla area to investigate the lease situation. This investigation was in connection with Scott's efforts to negotiate mineral leases for major oil companies. Items 2(a) to (h), inclusive, excepting (f) which is unexplained, were likewise spent in connection with Scott's efforts to negotiate leases for oil companies. None of these expenses was incurred in connection with leases acquired by Scott for himself. With respect to item 3, Scott's home telephone bill for the taxable year was $221.62. He was reimbursed for $74.20 of such amount, and $57.20 represented service charge. Scott estimated the amount of item 3, to wit, $90.22, by subtracting from his total telephone bill the amount he was reimbursed *133 and the service charge. The traveling expenses represented by item 4 were in part incurred in connection with Scott's leasing activities. The exact details of the nature and purpose of these trips are not indicated in the record. Scott owned a Packard automobile which was primarily used for personal purposes and a Mercury automobile which was primarily used for business purposes. The expenses represented by item 5 were incurred in connection with the Mercury, and include such items as batteries, storage charges, tires and gasoline. Scott used the Mercury driving from his home to the lumber companies' offices in Shreveport and Monroe, and back. Item 6 represents Scott's estimate of depreciation on the Mercury. Scott estimated the cost of the Mercury at about $1,100 and took depreciation at the approximate rate of 25 per cent of this cost a year. Respondent allowed petitioner no deduction whatsoever with respect to the expenses here involved. Community Property Issue. During the taxable year the following gross income was derived from the paraphernal property of petitioner: Dividends
$ 690.00
Interest: From father on open ac-
count
$3,696.43
From father on note
52.33
On note of Union Oil Mill
Co.
369.96
On joint savings account
20.83
On notes of Delta Cotton
Oil Co.
1,229.61
5,369.16
Income from mother's estate
2,810.55
Royalties
312.32
$9,182.03
*134 The dividends of $690 were received from 115 shares of Commercial National Bank of Shreveport stock owned by petitioner. One hundred of such shares had been purchased by her with her separate funds in 1932, the remaining 15 shares had been inherited by petitioner from her brother Milton in 1936. During the taxable year these shares were kept in the safe deposit box of petitioner's father. The dividend checks were made out and sent to petitioner. Petitioner endorsed them and gave them to her husband. Scott deposited such checks in petitioner's personal account. The funds in petitioner's personal account were used by her for her personal expenses, such as clothes and doctors' bills, and also for the benefit of the community, for such items as the children's clothes and household expenses. Proxies with respect to such stock were sent to petitioner, who handed them to her husband. Scott sometimes filled the proxies in with the name of someone but usually left them blank and returned them to the bank. Petitioner's father, as an official of the Commercial National Bank of Shreveport, could not vote such stock. The interest of $3,696.43 was received by petitioner by virtue of a loan to *135 her father in the approximate amount of $46,000. The amount of the loan had been inherited by petitioner from her mother in 1918. Petitioner's father, after administering the estate, had retained for his personal use the amount of $46,000 as a loan from his daughter. There was no note evidencing this indebtedness. Petitioner's father sent the checks representing interest on this loan to petitioner, who endorsed them and handed them to her husband, who in turn deposited such checks in a joint savings account. This savings account had been the individual account of Scott prior to his marriage to petitioner. Sometime after her marriage petitioner signed an appropriate signature card which converted this account into a joint account. Deposits to this joint account were derived predominantly from petitioner's separate property or the income therefrom although Scott made occasional deposits of his own earnings and income. Petitioner rarely, if ever, drew on this account. Scott discussed with petitioner's father from time to time the desirability of continuing the loan arrangement. As far as petitioner was concerned the decision whether or not to continue the arrangement was Scott's. *136 The interest item of $52.33 was paid to petitioner by her father on account of a loan of $1,500 made to him in 1940 and for which he had given petitioner a note. The interest item of $369.96 was paid to petitioner by Union Oil Mill Co. on account of a loan made to such company by petitioner in the amount of $5,000. This loan was made in 1938 with money drawn from the joint account above referred to and was evidenced by a note made out to petitioner. The principal of this note with accrued interest thereon was paid June 4, 1940 and was deposited by Scott in the joint account. Scott negotiated this loan for his wife. Petitioner's father had a financial interest in Union Oil Mill Co. The interest item of $20.83 was paid by the Commercial National Bank of Shreveport to petitioner and her husband on the credit balance of their joint account. The interest of $1,229.61 was paid to petitioner by the Delta Cotton Oil Co. on certain notes owned by petitioner. In 1939 petitioner's father and his second wife (petitioner's stepmother) gave their five children, including petitioner, certain notes of the Delta Cotton Oil Co. having a face value of $202,511.11. Scott, after consultation with *137 petitioner's father and with the approval of the interested children, arranged an agency agreement with the Commercial National Bank of Shreveport for the handling of these notes. This agreement, dated December 30, 1939 and signed by the interested children, including petitioner, and an official of the bank, provided in part as follows: These notes are owned by us and each of us has an undivided one-fifth interest therein. We request that you handle them as our agent under the following instructions: 1. You will hold the notes for us and collect the interest thereon, remitting one-fifth of it to each of us or crediting it in the same proportions to our respective accounts in compliance with such orders as we may give you from time to time. 2. You will hold or dispose of all principal payments in compliance with such orders as we may give you from time to time. 3. You will make your customary charge for services in handling these notes, deducting it from the interest payments as they are made. Petitioner's share of the interest on the Delta Cotton notes was left with the bank subject to instructions under the above quoted agency agreement until 1945. Petitioner received *138 in 1940 $2,810.55 from her mother's estate. This amount represented her share of the income from certain farms and other real estate inherited by petitioner from her mother in 1918, which were being administered and operated by petitioner's father. Income in the amount of $312.32 received by petitioner in 1940 represented certain oil royalties owned by her less allowable depletion. The royalty interests involved were acquired by purchase with petitioner's separate funds and were all located in Louisiana. The purchase of these royalty interests had been suggested and arranged by Scott. From the gross income of $9,182.03 derived from petitioner's paraphernal property, as set forth and explained above, $433.54, representing taxes and bank charges, is deductible which leaves net income from such sources in the amount of $8,742.49. Petitioner, on the theory that such income was community, reported on her return for her return for 1940 one-half thereof or $4,374.24. Respondent determined that such income constituted the separate property of petitioner and therefore, included the total amount thereof, or $8,748.49, as her income. The paraphernal property of petitioner as itemized above, *139 excepting the joint savings account, was not under the administration of her husband. Opinion Expense Issue. Respondent contends that petitioner has failed to prove the expenses sought to be deducted. It is unquestionably true that the proof of the expenses sought to be deducted is not altogether satisfactory. In some instances the amounts of the expenses appear to have been estimated in round numbers. In other instances the purposes and nature of the expenses are described in general terms. There are no records, receipts or vouchers in evidence to substantiate the expenses claimed to have been incurred. Despite the unsatisfactory state of proof, however, we are convinced that Scott did incur certain expenses in connection with his leasing activities. Hence, although the proof is somewhat vague in some instances. we have after a careful consideration of the record estimated the amounts of expenses which we consider allowable deductions and which have been set out in the schedule in the findings of fact. We think this treatment is justified by such authorities as ; ; . *140 We allowed expense item in full since the nature of the expenditure was explained in sufficient detail. We also allowed in full items 2(a) through (h), with the exception of (f) which was unexplained. Respondent, on brief, suggested that the expenses represented by item 2 were capital in nature. However, since Scott incurred these expenses while negotiating leases for others rather than in the process of acquiring any interest for himself we do not consider such expenses as capital. As set forth in the findings of fact Scott estimated the portion of his telephone bill which he considered attributable to business expenses by deducting from the total bill the service charge and other charges for which he was reimbursed. Although we are not satisfied with this method of estimation we are convinced that Scott did incur telephone expenses in connection with his leasing activities and have therefore allowed as a deduction one-half of the amount claimed. With respect to the traveling expenses represented by item 4, we are satisfied that Scott made the trips as itemized above and that he did incur the expenses claimed. We are not satisfied, however, that the trips made or the expenses *141 claimed were solely in connection with his leasing activities. The evidence is such that we are not certain that the trips and the expenses thereof were not partially incurred in connection with Scott's personal affairs. We have therefore allowed only one-half of the amount claimed as corrected. With respect to items 5 and 6, involving automobile expenses, we have allowed one-half of the amount claimed. Although we are satisfied that the Mercury automobile was used primarily for business purposes we are not satisfied that it was exclusively so used. Scott testified that he used the Mercury driving from his home to his offices at the lumber companies. We are not satisfied that the Mercury was not used for other personal purposes. For this reason we have allowed one-half of the expense and depreciation claimed. We hold, therefore, that petitioner, filing a separate return on a community basis, is entitled to deduct one-half of the expenses which we have found as allowable, to wit, $392.56. Community Property Issue. Respondent contends that the income derived from petitioner's paraphernal property is her separate income. Petitioner contends that such income falls into the community. *142 Whether or not such income constitutes community or separate property depends on the law of , and . Since both parties are agreed that the property from which the income in question was derived is petitioner's paraphernal property, the following provisions of the Louisiana Revised Civil Code of 1870 are controlling: Art. 2385. Wife failing to administer paraphernal property. - Management by husband. - The paraphernal property, which is not administered by the wife separately and alone, is considered to be under the management of the husband. Art. 2386. Fruits of paraphernal property - Ownership. - When the paraphernal property is administered by the husband, or by him and the wife indifferently, the fruits of this property, whether natural, civil, or the result of labor, belong to the conjugal partnership, if there exists a community of gains. If there do not, each party enjoys, as he chooses, that which comes to his hands; but the fruits and revenues, which are existing at the dissolution of the marriage, belong to the owner of the things which produce them. (As amended, *143 Acts 1871, No. 87.) The present controversy therefore depends on whether the paraphernal property of petitioner as here involved was "administered by the husband" within the meaning of the above quoted statutes. We do not think that the 115 shares of Commercial National Bank of Shreveport on which $690 in dividends were paid petitioner in 1940 can be considered as administered by Scott. One hundred of these shares were purchased by petitioner with her separate funds in 1932 and the remaining 15 shares were inherited by her from her brother. During the taxable year and prior thereto these shares were kept in the safety deposit box of petitioner's father. The dividend checks were made payable to petitioner and were deposited in her personal account. It is true that the checks were endorsed by petitioner and handed to Scott who deposited them. It is also true that petitioner allowed Scott to handle the proxies as he wished. We do not consider, however, such facts as constituting administration by Scott. The act of depositing a wife's income has not been considered determinative of administration by a husband. ; . *144 The exercise of the proxy rights by Scott appears to us under the circumstances to have resulted from petitioner's recurrent permission rather than from any continuous control or administration by Scott. The $46,000 loan by petitioner to her father does not appear to us to have been under Scott's administration. The loan was arranged between petitioner and her father prior to petitioner's marriage to Scott. The interest checks were made payable to petitioner. Under these circumstances there would appear to be very little administration required by Scott. It is true that here again petitioner gave Scott the endorsed checks which he deposited in their joint savings account. However, as indicated above, such action does not constitute administration. Petitioner states that her husband discussed with her father the desirability of continuing the arrangement and as far as she was concerned it was a matter for Scott to decide. Petitioner argues that that circumstance constituted administration by her husband. We are not impressed by this argument. Scott's only action in connection with the loan arrangement was apparently passive acquiescence. Scott's discussions with his wife's father *145 strike us as the type of business advice and assistance any husband would render his wife. As is stated in the summary of , in Louisiana Civil Code Ann., Dart. p. 858: * * * Fact that agent consulted husband as to crops, settlement of accounts, etc., subject always to wife's ratification, does not change character of administration. Such acts, resulting naturally from marital relation, are not in legal contemplation substantive acts of administration by which rights to property are acquired. * * * See also , and We find nothing in the record which would indicate that Scott had any administration over the $1,500 loan made by petitioner to her father in 1940 and on which petitioner received $52.33 interest in that year. There is no evidence as to the source of this loan nor any evidence explaining or describing its transaction. Petitioner contends that her husband had administration over the loan of $5,000 made to the Union Oil Mill Co. This loan was arranged by Scott and the funds therefor taken from the joint savings account. *146 The note evidencing the debt was made out to petitioner. Although Scott appears to have had more to do with this loan in the way of administration than he did with respect to the items discussed above, we are of the opinion that his activities in this connection were carried on by him as petitioner's agent. Under Louisiana law where a husband administers the paraphernal property of his wife as her agent, the income therefrom does not fall into the community. . Scott's testimony supports the conclusion that he acted for his wife in this connection. Scott stated on cross examination: * * * I felt that the money loaned in principal to the oil mill was her money, consequently the note was made to her, but taken from the joint account and redeposited in the joint account, both principal and interest, when it was paid. This statement by Scott further indicates to us that the loan was made or arranged by Scott for petitioner's benefit rather than his own or that of the community. As was said in : We do not think that this is a case of separate property of the wife under *147 "the administration" of her husband. Such a case is presented only when the husband, with the consent of the wife, uses the separate estate of the wife for his own benefit or that of the community. It is not presented when the husband acts merely as the agent of his wife and for her benefit. Cf. . So that the question is not so much by whom the property was physically managed as for whose benefit was it so managed. The $20.83 interest which was derived from the joint account of petitioner and her husband does, in our opinion, constitute community property. Scott made virtually all the deposits to and withdrawals from this account. He could do so without petitioner's knowledge or consent. Thus, it seems to us the joint account was clearly "administered by the husband, or by him and the wife indifferently" within the meaning of Art. 2386 of the Louisiana Civil Code. The notes of the Delta Cotton Oil Company owned by petitioner, we do not consider to have been under Scott's administration. Petitioner received her interest in these notes as a gift from her father and stepmother. It may be true that Scott was consulted by petitioner's *148 father in connection with such gift and that Scott arranged the agency agreement with the bank. The consultation activities of Scott in this respect we do not consider determinative of administration by him. ; ; We are also of the opinion that Scott's arrangement of the agency agreement with the bank was done by him as petitioner's agent. The terms of the agency agreement itself clearly precluded Scott from any administration over the notes in question. The situation here with respect to the Delta Cotton Oil Company notes is indistinguishable from the situation involved in , wherein it was said: * * * Certainly, this instrument, executed by Louise P. Lucas apparently after her marriage, evinces an imention on her part to vest the control, management, and administration of her separate property in someone other than her husband. Under the terms of this instrument the agent was not required to consult the husband of the taxpayer in and about the management of the property; and the husband did not give one, specific *149 instance where he had given advice to the agent. Nowhere does the record show that the husband administered this separate property "as if the property was his own." * * * With respect to the $2,810.55 received by petitioner in 1940 from her mother's estate we think the record wholly fails to support the contention of administration by petitioner's husband. The income in question was derived from farms and other real estate inherited by petitioner from her mother in 1918. This property was under the control and management of petitioner's father. There is vague testimony to the effect that Scott discussed the management of such property from time to time with petitioner's father. There is, however, no indication that the administration of the property changed at all after petitioner's marriage to Scott nor is any instance cited where petitioner's father was influenced as a result of his discussions with Scott. Petitioner contends that the royalties received by her in 1940 constituted community property. The royalties were purchased with petitioner's separate funds. Scott negotiated the transaction and made the necessary arrangements. Here again, however, it appears to us that Scott's *150 activities in this respect were carried on as petitioner's agent and for her benefit. ; The case of , although distinguishable in certain respects from the instant case, is analogous to the situation here involved. In that case the court said: What is meant by leaving the administration of the wife's property to the husband is the exercise of a voluntary election by which the wife abandons her own rights of authority and control and suffers the husband to manage, not as her agent and subject to her authority, but as if the property were his own. * * * Petitioner contends that under the law of Louisiana there is a presumption that the paraphernal property of the wife is administered by the husband unless the contrary is positively established. Petitioner argues that this presumption is part and parcel of the local property law and is therefore controlling in petitioner's favor for Federal tax purposes. In , we said: For purposes of Federal taxation the determination of the Commissioner is presumptively *151 correct and we think it is well settled that, when presumptions arising under local law clash with the presumption of correctness attaching to the Commissioner's determination, the conflict resolves itself in favor of the respondent and the petitioner retains the burden of proof. ; ; . Hence, the petitioner must come forward with evidence for the purpose of establishing that the property in question was under the administration of her husband or was administered by him and the wife indifferently. We do not read , as announcing a rule to the contrary. We think the above quotation answers petitioner's argument in this connection. In any event we think there is ample evidence in the record before us to overcome the presumption raised by local law. See We hold, therefore, that respondent correctly considered and treated as petitioner's separate property the items of income here involved with the exception of the interest of $20.83 received from the joint savings *152 account. Since we hold that this latter item constituted community property, only one-half thereof is includible in petitioner's income. Decision will be entered under Rule 50. Footnotes
*. Petitioner states that $35 should be deducted from traveling expenses. ↩
**. In Scott's testimony and in petitioner's brief the total traveling expenses are stated as $612.65 and this is the amount actually claimed as a deduction. Since this figure apparently results from mathematical error we have substituted the figure $597.11 which changes the total from $1,535.64 to $1,520.11.↩